UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

In re: Louis A. Gencarelli, Sr.

| | | |
|---|---|---|
| UPS CAPITAL BUSINESS CREDIT, Appellant | : | |
| VS | : | C.A. 05-39T<br>BK AP No. 04-10630<br>BK AP No. 04-10682 |
| LOUIS A. GENCARELLI, SR., ET AL, Appellee | : | |

**On Appeal from Bankruptcy Court**

BRIEF OF APPELLANT,
UPS CAPITAL BUSINESS CREDIT

Edward L. Pontocaloni
Barbara A. Frederick
(Admitted *Pro Hac Vice*)
Updike, Kelly & Spellacy, P.C.
One State Street
P.O. Box 231277
Hartford, CT 06123-1277
Telephone #: (860) 548-2600
Fax #: (860) 548-2680

Thomas J. Cronin (#5302)
GUNNING & LAFAZIA, INC.
56 Pine Street
Providence, RI 02903
Telephone #: (401) 521-6900
Fax #: (401) 521-6901
Direct Dial #: (401) 521-7977

14

# Table of Contents

Table of Authorities .......... i

Statement of Jurisdiction .......... 1

Statement of Issues and Applicable Standard of Review .......... 1

Introduction .......... 1

Statement of the Case .......... 3

A. Brief Description of the Proceedings .......... 3

B. Detailed Statement of Facts and Proceedings .......... 4

Argument .......... 10

I. The Bankruptcy Court Erred in Disallowing UPS's Claims for Prepayment Premiums .......... 10

A. As a Matter of Law, UPS Is Entitled to Recover Its Prepayment Premiums as a Secured Claim under §506(b) .......... 10

1. The Bankruptcy Court Applied an Erroneous Standard in Disallowing the UPS Prepayment Premiums under 11 U.S.C. §506(b) .......... 10

2. The Bankruptcy Court Abused Its Discretion in Striking the Evidence that UPS Presented during the Evidentiary Hearing on December 22, 2004 .......... 17

B. UPS Is Entitled to Recover the Prepayment Premiums Even if Such Premiums Are "Unreasonable" and Not Allowable as a Secured Claim under §506(b) ... 19

Conclusion .......... 20

# Table of Authorities

## Cases

229 Main St. Ltd. Pshp. v. Mass. EPA, 262 F.3d 1 (1st Cir. 2001) .................................... 20

Atlantic Ltd. P'ship-XI v. John Hancock Mut. Life Ins. Co., 95 F. Supp. 2d 678 (D. Mich. 2000) .................................... 1

Baybank-Middlesex v. Ralar Distribs., 69 F.3d 1200 (1st Cir. 1995) .................................... 1

Carlyle Apartments Joint Venture v. AIG Life Ins. Co., 635 A.2d 366 (Md. 1994) .......... 1, 2, 16

Cotheal v. Talmage, 9 N.Y. 551 (1854) .................................... 15

Days Inns of America, Inc. v. Regency Manor, Ltd, 94 F. Supp. 2d 1200 (D. Kan. 2000) ....... 18

Ferrari v. Barclays American Business Credits, Inc., 87 B.R. 745 (Bankr. D. Mass. 1988) ...... 12

Florida Nat'l Bank of Miami v. Bankatlantic, 557 So. 2d 596 (Fla. Dist. Ct. App. 1990) ........... 1

Holliston Mills, Inc. v. Citizens Trust Co., 604 A.2d 331 (R.I. 1992) .................... 1, 11, 17

Honey Dew Assocs., Inc. v. M & K Food Corp., 241 F.3d 23 (1st Cir. 2001) .......................... 18

In re A.J. Lane & Co., 113 B.R. 821 (Bankr. D. Mass. 1990) .................... 11, 12, 13, 14, 16, 18

In re Anchor Resolution Corp., 221 B.R. 330 (Bankr. D. Del. 1998) .................................... 16

In re Commercial Envelope Mfg. Co., Inc., 3 Bankr. Ct. Dec. 647 (Bankr. S.D.N.Y. 1977) ...... 7

In re Imperial Coronado Partners, Ltd., 96 B.R. 997 (B.A.P. 9th Cir. 1989) ............................ 19

In re Duralite Truck Body & Container Corp., 153 B.R. 708 (Bankr. D. Md. 1993) .............. 16

In re Financial Ctr. Assocs., 140 B.R. 829 (Bankr. E.D.N.Y. 1992) .................................... passim

In re Kroh Bros. Dev. Co., 88 B.R. 997 (Bankr. W.D. Mo. 1988) .................................... 12

In re Morse Tool, Inc., 87 B.R. 745 (Bankr. D. Mass. 1988) .................................... 12

In re Rijos, 263 B.R. 382 (B.A.P. 1st Cir. 2001) .................................... 19

In re Snelson, 305 B.R. 255 (Bankr. N.D. Tex. 2003) .................................... 18

In re United Merchants & Mfrs., Inc., 674 F.2d 134 (2d Cir. 1982) .................................... 15, 18

In re Vecco Constr. Indus., Inc., 4 B.R. 407 (Bankr. E.D. Va. 1980) .......................................... 7

In re Warner, 247 B.R. 24 (B.A.P. 1st Cir. 2001) .......................................................... 1

National Hearing Aid Centers, Inc. v. Smith, 376 A.2d 456 (Me. 1977)..................................... 12

Nixon v. Mo. Mun. League, 541 U.S. 125 (2004)........................................................ 20

Pacific Trust Co. TTEE v. Fidelity Fed. Savings & Loan Ass'n., 229 Cal. Rptr. 269
(Cal. Ct. App. 1986) ................................................................................ 1

Pacheco v. Scoblionko, 532 A.2d 1036 (Me. 1987)........................................................ 18

Sharman v. S&S Realty Assocs., No. 03-6681, 2004 R.I. Super. Lexis 110
(Super. Ct. R.I. 2004) .............................................................................. 11

Trilon Plaza, Inc. v. Comptroller of the State of New York, 788 A.2d 146 (D.C. 2001)............. 2

United States v. American Trucking Ass'ns, 310 U.S. 534 (1940)........................................ 20

Walter E. Heller & Co. v. American Flyers Airline Corp., 459 F.2d 896 (2d Cir. 1972).......... 18

Westmark Commercial Mortgage Fund IV v. Teenform Assocs., L.P., 827 A.2d 1154
(N.J. Super. Ct. App. Div. 2003) ................................................................... 1

Wezel v. Advocate Realty Inv., LLC, 275 F.3d 1308 (11th Cir. 2001) .................................. 19

Young v. Sodaro, 456 S.E.2d 31 (W. Va. 1995) ............................................................ 2

**Federal Statutes**

11 U.S.C. §105(a). ......................................................................................... 16

11 U.S.C. §363.............................................................................................. 6

11 U.S.C. §506(b) .................................................................................... passim

15 U.S.C. §636(a)(4)(C) ................................................................ 1, 12, 16, 17

28 U.S.C. §157.............................................................................................. 1

28 U.S.C. §158.............................................................................................. 1

**State Statutes**

R.I Gen. Laws §34-23-5 .......... 11

**Rules of Procedure**

FED. R. BANKR. P. 1015 .......... 6

**Other Authorities**

Bartleby's Quotations. .......... 20

Cowens, BANKRUPTCY LAW AND PRACTICE, §3.7 (6th Ed., 1994) .......... 7

Dale A. Whitman, Mortgage Prepayment Clauses: An Economic and Legal Analysis, 40 UCLA L. REV. 851 (1993) .......... 3

Restatement (Second) of Contracts §356 and cmt. b .......... 13, 14, 15, 17, 18

Restatement (Third) of Property, Mortgages, §6.1 .......... 2

Restatement (Third) of Property, Mortgages, §6.2 cmt. a. .......... 3, 15

Restatement (Third) of Property, Mortgages, §6.2 cmt. d .......... 16

## Statement of Jurisdiction

The Bankruptcy Court had jurisdiction pursuant to 28 U.S.C. §157, A153.[1] This Court has jurisdiction pursuant to 28 U.S.C. §158, A155.

## Statement of Issues and Applicable Standard of Review

I. Whether the appellant, UPS Capital Business Credit ("UPS"), is entitled, as a matter of law, to the contractually agreed upon prepayment premiums as a secured claim under §506(b) of the Bankruptcy Code? This issue implicates two standards of review. First, appellate review of the Bankruptcy Court's interpretation and application of §506(b) is plenary. See Baybank-Middlesex v. Ralar Distribs., 69 F.3d 1200, 1202 (1st Cir. 1995). Second, the abuse of discretion standard applies to the Bankruptcy Court's decision, after the fact, to strike certain evidence. See In re Warner, 247 B.R. 24, 25 (B.A.P. 1st Cir. 2001). Discussion begins at page 10.

II. Whether, under the undisputed facts of this case, UPS is entitled to the prepayment premiums even if such premiums are not allowable as a secured claim under §506(b)? This issue is subject to plenary review. See Baybank-Middlesex, 69 F.3d at 1202. Discussion begins at page 17.

## Introduction

This case presents to the court the common practice of the commercial finance industry to assess loan prepayment premiums.[2] A prepayment premium is an agreed upon consideration for

---

[1] References to "A__" are to pages of the separately bound Appendix to this brief. For the Court's convenience, copies of the cases cited in this brief have been included in the Appendix beginning at page A174.

[2] That the convention is common and a matter of wide spread custom and usage in the commercial lending industry is evident from the numerous cases around the country dealing with the subject. See, e.g., Atlantic Ltd. P'ship-XI v. John Hancock Mut. Life Ins. Co., 95 F. Supp. 2d 678, 681-84 (D. Mich. 2000); Pacific Trust Co. TTEE v. Fidelity Fed. Savings & Loan Ass'n., 229 Cal. Rptr. 269, 272-75 (Cal. Ct. App. 1986); Florida Nat'l Bank of Miami v. Bankatlantic, 557 So. 2d 596, 597-98 (Fla. Dist. Ct. App. 1990); Carlyle Apartments Joint Venture v. AIG Life Ins. Co., 635 A.2d 366, 366-73 (Md. 1994); Westmark Commercial Mortgage Fund IV v. Teenform Associates, L.P., 827 A.2d 1154, 1158-62 (N.J. Super. Ct. App. Div. 2003); Holliston Mills, Inc. v. Citizens Trust Co., 604 A.2d 331, 335-38 (R.I. 1992). The custom and practice is even followed by the U.S. Small Business Administration in connection with long term loans under its national government guaranteed 7(a) loan program. See 15 U.S.C. §636(a)(4)(C), A151.

the right of a borrower to prepay a loan. Such agreements are necessary because a borrower generally may not prepay a loan and thereby deny the lender the benefit of its bargain. This is commonly known as the rule of "perfect tender in time."[3] The benefit bargained for by the lender is the security of a regular flow of income based upon the bargained for rate of return.[4] See Tr. 12/15 at 9, 20-22 and 28, A63, A70-72 and A76.

In modern commercial finance, the funding of loans is often derived from investors who purchase the commercial paper evidencing the loan. Id. at 11, A64. These loan sales are conducted on what is known as the "secondary market." Id. The funds received by the lender upon the sale of the loan are then available to lend to new borrowers. This is a common funding cycle of modern commercial finance. See Tr. 10/7 at 14-15, A56-A57.

Investors who make these investments do so in anticipation of the revenues or interest to be earned over the term of the loan. Tr. 12/15 at 24, A74. The investors pay to the lender a premium over and above the face amount of the loan. Id. at 13 and 24, A66 and A79. The premium is the lender's profit or income from the origination, underwriting and making of the loan. If a loan is prepaid, the investors suffer a loss. See id. at 13, A66; UPS Ex. 9, A123. The investors may contractually transfer this loss to the lender and demand a refund of the premium. Tr. 12/15 at 25, 28-30, A75-A78; see UPS Ex. 8, A121. In that way, the lender suffers the loss of its gain on the sale of the loan.

The negotiated prepayment premiums are intended to compensate the investor or the

[3] See Trilon Plaza, Inc. v. Comptroller of the State of New York, 788 A.2d 146, 151 (D.C. 2001); Young v. Sodaro, 456 S.E.2d 31, 34 (W. Va. 1995); compare Restatement (Third) Property, Mortgages, §6.1, A169.

[4] See, e.g., In re Financial Ctr. Assocs., 140 B.R. 829, 834-38 (Bankr. E.D.N.Y. 1992); Young, 456 S.E.2d at 34-35; Carlyle Apartments, 635 A.2d at 371-73.

lender for the losses resulting from the prepayment.[5] Tr. 12/15 at 22, A72. These include the loss of the benefit of the bargain, or the anticipated return on the investment either as a component of the lost interest revenue (the "yield") or as a component of the lost purchase premium, as well as the costs associated with having to reinvest the principal, among other things. The loss may be substantial.[6]

## Statement of the Case

### A. Brief Description of the Proceedings

In February 2002, the appellees, Bess Eaton Donut Flour Company, Inc. ("Bess Eaton"), and its owner, Louis Gencarelli, Sr., entered into two commercial mortgage loan contracts with UPS. Decision and Order Denying UPS Capital Business Credit Claim Nos. 37 & 38 ("MOD") at 1, A41. Hereinafter, Bess Eaton and Mr. Gencarelli are referred to, collectively, as the "Debtors," and the loans are referred to, collectively, as the "Loans."

In March 2004, the Debtors filed separate voluntary petitions under Chapter 11 of the Bankruptcy Code for the purpose of facilitating an already negotiated sale of the mortgaged property and the operating assets of Bess Eaton. Id. at 2, A42. UPS filed a proof of claims in each of the bankruptcy proceedings, seeking payment of, inter alia, the outstanding principal balances and accrued interest, as well as certain prepayment premiums ("Prepayment Premiums") in accordance with the terms of the loans. See UPS Proofs of Claims, Nos. 37 and 38, A1 and A2. Hereinafter, UPS's proofs of claims are referred to, collectively, as the "UPS Claims."

---

[5] It is interesting to note that Debtors' counsel asked Mr. Dahms on cross-examination if there was some form of "insurance" or a "mechanism by which [UPS] could have mitigated its risk." Tr. 12/15 at 30 and 33, A78 and A80. The prepayment premium is precisely such a mechanism. "The insurance 'premium' is the prepayment fee itself." Dale A. Whitman, Mortgage Prepayment Clauses: An Economic and Legal Analysis, 40 UCLA L. REV. 851, 873 (1993), A165. The mere asking of the question evidences the Debtors' acknowledgement of the risk of loss.

[6] See Financial Ctr. Associates, 140 B.R. at 835-37; see also Restatement (Third) of Property § 6.2 cmt. a, A170.

The Bankruptcy Court authorized a sale at auction, and the sale yielded funds sufficient not only to pay the claims of all creditors, both secured and unsecured, in full plus interest, but also to provide the Debtors with a substantial surplus. MOD at 2, A42. Nonetheless, Mr. Gencarelli objected to UPS's claim for the agreed upon Prepayment Premiums, arguing that such premiums were unreasonable and must be disallowed pursuant to §506(b) of the Bankruptcy Code. See id. at 1, A41.

After oral argument on October 7, 2004, the Bankruptcy Court, *Votolato, J.*, determined that, under §506(b), a "single federal standard," governed the allowability of the Prepayment Premiums. Id. On December 15, 2004, UPS presented evidence demonstrating the losses it had suffered as a result of the prepayment of the Loans. Id. at 3, A43. Thereafter, the Bankruptcy Court advised counsel that it would require further evidence. A second evidentiary hearing followed on December 22, 2004. On January 19, 2005, the Bankruptcy Court issued a decision and order disallowing UPS's claims for the Prepayment Premiums. Id. at 6, A46.

On February 1, 2005, UPS filed a Notice of Appeal. Notice of Appeal, A48. UPS subsequently filed a Motion for Extension of Time to File a Late Notice of Appeal, and, on February 11, 2005, the Bankruptcy Court, *Votolato, J.,* issued an order granting such motion as to the Notice of Appeal filed on February 1, 2005. Order Granting Application/Motion, A54.

**B. Detailed Statement of Facts and Proceedings**

In February of 2002, UPS made the Loans to Mr. Gencarelli and a corporation of which Mr. Gencarelli was a principal, Bess Eaton. MOD at 1, A41; UPS Claims, A1 and A2. The first loan was in the principal amount of $5,000,000 and for a term of thirty years, and the second loan was in the principal amount of $2,000,000 and for a term of twenty years. UPS Claims, A1 and A2.

The Loans were each evidenced by a promissory note (the "Notes"). MOD at 1, A41; UPS Ex. 1, A101; UPS Ex. 2, A106. The Debtors were co-makers of the Notes and jointly and severally liable for the payment thereof. MOD at 1, A41; UPS Ex. 1, A101; UPS Ex. 2, A106. At the time of the Loans, the lender and the Debtors were commercially sophisticated, and each was represented by legal counsel. See Tr. 10/7 at 11, A55; Tr. 12/15 at 46, A84. The parties agreed that the Loans could be prepaid, and that each of the Notes required the payment of a premium in the event of prepayment, the amount of which was a sliding percentage of the amount prepaid during each of the first five years of the loan term. MOD at 2, A42; UPS Ex. 1, A101; UPS Ex. 2, A106.

In late November 2003, the $5,000,000 loan was sold by UPS to Union Planters National Bank. UPS Ex. 3, A111; UPS Ex. 4, A113; UPS Ex. 5, A114; Tr. 12/15 at 12, A65. Union Planters National Bank, in turn, sold or participated portions of the $5,000,000 loan to other investors, among them PEE DEE Farm Credit, FCLA (hereinafter, Union Planters National Bank and the other participants in the purchase of the loans are referred to, collectively, as the "Investors"). Tr. 12/15 at 14, A67; UPS Ex. 7, A119. The total premium paid by the Investors upon the purchase of the $5,000,000 loan was $314,417.72. Tr. 12/15 at 18, A69; see UPS Ex. 8, A121. UPS retained the servicing responsibility for the $5,000,000 loan, and it acknowledged responsibility to the Investors for Prepayment Premiums payable under the $5,000,000 Note. UPS Ex. 6, A118; Tr. 12/15 at 13, A66. The Prepayment Premiums under the $5,000,000 Note were of material concern to the Investors. See UPS Ex. 9, A123. UPS retained the $2,000,000 loan. Tr. 12/15 at 28, A76

Each of the Notes was secured by mortgages on various real properties in the names of the Debtors. UPS Claims, A1 and A2. Sometime prior to March of 2004, the Debtors engaged in negotiations with a third party, Tim Hortons (New England), Inc., for the sale of the mortgaged properties and the business assets of Bess Eaton. MOD at 2, A42. At that time, the Debtors were

performing under the Loans in accordance with the loan terms. In March of 2004, the Debtors filed separate bankruptcy petitions under Chapter 11 of the United States Bankruptcy Code.[7] Id. The cases were subsequently consolidated for administrative purposes.[8] Order Re: Motion to Administratively Consolidate, A3.

Shortly after filing their bankruptcy petitions, the Debtors sold the mortgaged properties to Tim Hortons (New England), Inc. pursuant to §363 of the Bankruptcy Code, and the liens of the UPS mortgages attached to the sales proceeds.[9] MOD at 2, A42; Order Approving Sale of Debtors' Operating Business Assets and Related Real Estate, A4. As determined by the sale, the Debtors' interest in these properties was greater than the total amount of the UPS Claims. Indeed, the amount realized from the sale was enough to pay all of the Debtors' creditors, in full, with interest, and leave a substantial surplus for Mr. Gencarelli, both personally and as the sole shareholder of Bess Eaton. MOD at 2, A42; Order Granting Debtors' Amended Application To Distribute Sale Proceeds at Closings, Including Payment of Secured Claims, Taxes and Cure Amounts (the "Distribution Order"), A19.

In accordance with the Distribution Order, the UPS Claims were allowed and paid, subject to the Debtors' reservation of right to challenge those portions of the claims attributable to the Prepayment Premiums due under the Notes, which amounts were escrowed with Debtors' counsel. Distribution Order, A19. The distribution to UPS resulted in the prepayment of the Loans; whereupon, the Investors made demand upon UPS for the payment of the Prepayment Premiums or the refund of the loan purchase premium. Tr. 12/15 at 25, A75; UPS Ex. 8, A121; UPS Ex. 9, A123. UPS refunded the $314,417.72 loan purchase premium on November 29, 2004, resulting in the loss of its gain on the sale of the $5,000,000 loan. Tr. 12/15 at 25, 31, A75 and A79; UPS Ex.

---

[7] See 11 U.S.C. §101 et seq.
[8] See FED. R. BANKR. P. 1015(b), A158.
[9] See 11 U.S.C. §363, A146

10, A125; UPS Ex. 11, A130. UPS also suffered the loss of its bargain with regard to the $2,000,000 loan. Tr. 12/15 at 28-29 and 35, A76-A77 and A81. UPS claims Prepayment Premiums in the amount of $146,077.41 for the $5,000,000 loan and $56,744.89 for the $2,000,000 loan, or a total of $202,822.30. See MOD at 2, A42.

In October, 2004, Mr. Gencarelli filed his objection to that portion of UPS's claim consisting of the Prepayment Premiums. Bess Eaton did not object.[10] The nexus of Mr. Gencarelli's objection was that the Prepayment Premiums were an unreasonable charge under §506(b) of the Bankruptcy Code.[11] Debtors' Memorandum In Support of Partial Objection to Secured Claims Numbers 37 and 38, UPS Capital Business Credit, A30. On October 7, 2004, the Bankruptcy Court, *Votolato, J.*, heard oral arguments on the Gencarelli objection, but no evidence was presented at that time. The Bankruptcy Court determined that the objection was governed by §506(b) and that a "single federal standard" would apply to the allowance of the Prepayment Premiums. Order, October 8, 2004, A36. Because no evidence had been presented at the October 7th hearing, the Bankruptcy Court continued the case for an evidentiary hearing. Id.; see also Tr. 10/7 at 19, A58.

An evidentiary hearing was then held on December 15, 2004. At this hearing, UPS presented the testimony of Jeffrey B. Dahms, the UPS Director of Loan Accounting. Tr. 12/15 at 4, A59. Mr. Dahms testified as to his knowledge of, and familiarity with, the operations of UPS, and particularly with regard to the sale of loans to investors on the secondary market as a means of funding commercial finance. With regard to the UPS Claims, Mr. Dahms testified as to the sale of

---

[10] In this regard it is notable that the Debtors' cases were consolidated solely for purposes of joint administration under FED. R. BANKR. P. 1015, A158. The cases were not substantively consolidated. A substantive consolidation combines the assets and debts of the several entities. See Cowens, BANKRUPTCY LAW AND PRACTICE, §3.7 (6th Ed., 1994), A160; In re Vecco Constr. Indus., Inc., 4 B.R. 407, 409 (Bankr. E.D. Va. 1980); In re Commercial Envelope Mfg. Co., Inc., 3 Bankr. Ct. Dec. 647, *7 (Bankr. S.D.N.Y. 1977).

[11] See 11 U.S.C. §506(b), A150.

the Loan to Union Planters National Bank. Id. at 12; A65; UPS Ex. 3, A111. He testified as to the premium that was paid by the Investors and the Investors' reliance upon the pre-payment provisions under the Notes in determining the amount of the purchase premium. Tr. 12/15 at 14, A67.

Mr. Dahms furthermore testified as to the Investors' demands for the payment of the Prepayment Premiums due on the $5,000,000 loan or a refund of the purchase premium, and through him were introduced UPS Exhibits 8 and 9. Id. at 17-18, A68-A69. He also testified that UPS did ultimately refund the purchase premium, causing it the loss of its gain on the sale of the Loans in the amount of $314,417.72. Id. at 25, A75. Through Mr. Dahms were introduced UPS Exhibits 10 and 11 evidencing the refund of the purchase premium. Mr. Dahms also testified to approximate losses attributable to the "lost income stream" on the Loans. These were roughly estimated to be approximately $338,000. Id. at 23 and 36-37, A73 and A82-A83.

Following the hearing on December 15, 2004, the Bankruptcy Court advised counsel for UPS and Gencarelli that it would require further evidence, making it apparent that the Court wanted evidence not merely of the losses actually suffered by UPS as a consequence of a refund of the loan purchase premium; but, of the losses that were actually attributable to any reinvestment of the funds received upon the repayment of the loans. Id. at 5-6, 8-9, A60-A63. The Court sought "hard numbers." Id. at 12, A65. This second evidentiary hearing was held on December 22, 2004.

At the second evidentiary hearing, Mr. Dahms again testified. This time, Mr. Dahms had prepared various charts and graphs detailing the time and cost factors associated with re-lending the pre-paid loan funds. UPS Ex. 13, A137; UPS Ex. 14, A141; UPS Ex. 15, A142; UPS Ex. 16, A143. Using UPS Exhibit 13, he testified as to yield loss with regard to the $5,000,000 loan assuming that UPS mitigated its loss by a reinvestment of the funds at the UPS cost of funds rate over 6, 9 and 12 months, assuming that duration was necessary to re-lend the funds on similar loan

terms. The range was between $122,000 and $242,000. Tr. 12/22 at 20-22, A91-A93. He similarly testified with regard to the $2,000,000 loan, demonstrating estimated losses of between $87,000 and $133,000. Id. at 26-27, A94-A95.

Utilizing UPS Exhibit 14, Mr. Dahms presented details of loans made by UPS in amounts similar to the prepaid Loans during the months immediately following the prepayment, demonstrating that it took an average of 197 days, or roughly six and a half months for UPS to re-deploy the prepaid Loan funds. Id. at 29, A97. And, Mr. Dahms went further, averaging the salary and related costs of loan origination on a per loan dollar basis; See UPS Ex. 15, A142; and testifying that the expense allocable to re-lending $5,000,000 would be $99,483, while the cost of re-lending the $2,000,000 would be $39,793. Tr. 12/22 at 31-32, A99-A100; UPS Ex. 13, A137; UPS Ex. 5, A142.

In summary, the testimonial and mathematical evidence presented at the hearing on December 22, 2004, established a claim of damages in the approximate amount of $309,744 for the roughly six month period that it took for UPS to redeploy funds roughly equivalent to the amount it received upon the prepayment of the Loans. UPS Ex. 13, A137. These were losses reasonably to be anticipated by UPS at the time of the Loans, and justified the Prepayment Premiums. Tr. 12/15 at 20-22, A91-A93. The Bankruptcy Court, however, was looking for "hard numbers"; Tr. 12/22 at 12, A90; or actual losses. The actual damages suffered by UPS as a consequence of having to refund the purchase premium to the Investors did not satisfy the Bankruptcy Court, and the Court was also not satisfied with the evidence of the yield losses and costs attributable to new loan originations. The Court sustained the Gencarelli objection and sua sponte denied the UPS claim against Bess Eaton. See MOD at 1, A41. UPS claims error.

## Argument

### I. The Bankruptcy Court Erred in Disallowing UPS's Claims for Prepayment Premiums

The Bankruptcy Court's order disallowing UPS's claims for the Prepayment Premiums is erroneous, as a matter of law, in two respects. First, the Bankruptcy Court applied an erroneous standard in disallowing the Prepayment Premiums under 11 U.S.C. §506(b). Second, even if UPS is not entitled to recover the Prepayment Premiums as a secured claim under §506(b), it still is entitled to recover such premiums as an unsecured claim.

#### A. As a Matter of Law, UPS Is Entitled to Recover Its Prepayment Premiums as a Secured Claim under §506(b)

Section 506(b) of the Bankruptcy Code provides:

> To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

11 U.S.C. §506(b), A150. It is undisputed that UPS is an oversecured creditor and that the loan contracts at issue provide for prepayment premiums. Consequently, if the claimed Prepayment Premiums are "reasonable…charges," then §506(b) specifically entitles UPS to recover such premiums. See id. The first issue presented to the Bankruptcy Court concerned the legal standard under which the reasonableness of the Prepayment Premiums would be determined. In this regard, the standard applied by the Bankruptcy Court was erroneous. Further, as set forth below, regardless of whether a state, a combined state-federal or a "single" federal standard governs reasonableness under §506(b), such standard was satisfied in this case.

##### 1. The Bankruptcy Court Applied an Erroneous Standard in Disallowing the Prepayment Premiums under 11 U.S.C. §506(b)

The first issue presented to the Bankruptcy Court concerned the legal standard under which

the allowability of the Prepayment Premiums would be determined under 11 U.S.C. §506(b). This was the issue considered at the initial hearing on October 7, 2004. Tr. 10/7 at 4 and 8, A54a-A54b. The Notes provided that they were governed by the law of the State of Rhode Island. UPS Ex. 1, A101; UPS Ex. 2, A106. Had the Bankruptcy Court determined that a State law standard applied, then the prepayment premiums should have been allowable without further proceedings. Holliston Mills, Inc. v. Citizens Trust Co., 604 A.2d 331, 333-37 (R.I. 1992); Sharman v. S&S Realty Assocs., No. 03-6681, 2004 R.I. Super. Lexis 110 (Super. Ct. R.I. 2004); see also R.I Gen. Laws §34-23-5 (prepayment penalties authorized with regard to certain mortgage loans), A157.

The Rhode Island Supreme Court has expressly recognized that "[a] prepayment premium is not a charge for the use of money, but is instead a consideration granted to the party who has extended to the borrowing party the option or privilege of early repayment and avoidance of further accrued interest." Holliston Mills, 604 A.2d at 338 (emphasis added). The Court "decline[d] to rewrite documents in the banking industry," stating: "This is a benefit that Citizens bargained for with Holliston having full knowledge, as a benefit for Citizen's loaning such a large sum of money and extending to Holliston the privilege of prepayment." Id. at 337-38.

The Sharman case is even more noteworthy in that it involved a state court insolvency proceeding, or receivership, and the Rhode Island Superior Court specifically rejected the debtor's claim that the allowability of the prepayment premiums had to be tested under the reasonableness standard of Bankruptcy Code §506(b)[12] and the case of In re A.J. Lane & Co., 113 B.R. 821 (Bankr. D. Mass. 1990), the authority upon which Mr. Gencarelli relied for his objection.

In light of Rhode Island law, this is the result the Bankruptcy Court below should also have obtained had it determined that a dual state and federal Standard applied. See In re Financial Ctr. Assocs. of East Meadow, L.P., 140 B.R. 829, 835 (Bankr. E.D.N.Y. 1992) (applicability of State

[12] 11 U.S.C. §506(b), A150.

law controlling, even after application of the §506(b) reasonableness standard); Ferrari v. Barclays American Business Credits, Inc., 87 B.R. 745, 748 (Bankr. D. Mass. 1988) (concluding that §506(b) implicates a combined state/federal standard of reasonableness); compare In re Kroh Bros. Dev. Co., 88 B.R. 997, 999 (Bankr. W.D. Mo. 1988) (prepayment premiums disallowed under dual state and federal standard); compare also In re Morse Tool, Inc., 87 B.R. 745, 749-50 (Bankr. D. Mass. 1988) (dual state and federal standard applied to disallow prepayment premiums in absence of proof of actual damages).

However, the Bankruptcy Court, following the reasoning of the A.J. Lane Court, determined that Bankruptcy Code §506(b) preempts State law, and that a "single federal standard (of reasonableness)" would be applied. MOD at 1, A41; see Order dated October 8, 2004, A36. Nothing in §506(b) expressly supports this determination, and whether Congress intended such a result has been the subject of much debate. Compare A. J. Lane, 113 B.R. at 828-30, with Financial Ctr. Assocs., 140 B.R. at 836-37. Regardless, the determination that a "single federal standard" applies begs the question, what federal standard? If a directive by Congress evidences a federal determination of reasonableness by which to measure the allowability of prepayment premiums under §506(b), then a simple resort to the Congressional authorization of prepayment premiums under the United States Small Business Act[13] should compel the conclusion that such premiums are reasonable, the reasonableness of a legislative enactment being presumed. See National Hearing Aid Centers, Inc. v. Smith, 376 A.2d 456, 460 (Me. 1977). However, as noted by the Court in Financial Ctr. Assocs., "there is no uniform federal standard"; 140 B.R. at 839 (emphasis added); and this lack of such a uniform standard is at the heart of the errors below.

---

[13] See 15 U.S.C. §636 (a)(4)(C), A151. Pursuant to this provision, the U.S. Small Business Administration requires that a borrower who voluntarily prepays a SBA guaranteed loan having a term of not less than 15 years shall pre-payment fee, or "subsidy recoupment fee," the amount of which is based on a sliding percentage of 5 percent in the first year, 3 percent in the second year and 1 percent in the third year.

The consequences of a lack of a uniform federal standard are amply evidenced by the result in this case. Disregarding, for the moment, Judge Votolato's comments at the hearing on December 22, 2004, to the effect that he was looking for "hard numbers;" Tr. 12/22 at 12, A90; nowhere in Judge Votolato's Order of October 8, 2004 or in his Decision of January 19, 2005, is there any recitation of the standard that he would or did apply in determining the allowability of the prepayment premiums.[14] Based upon the Bankruptcy Court's reliance upon A.J. Lane, as expressed in the Order of October 8, 2004, one might assume that the Bankruptcy Court would apply the standard established in that case.

After determining that prepayment premiums were a form of liquidated damages, the A.J. Lane Court then adopted the test of reasonableness stated in Restatement (Second) of Contracts:

> The first factor is the anticipated or actual loss caused by the breach. The amount fixed is reasonable to the extent that it approximates the actual loss that has resulted from the particular breach, even though it may not approximate the loss that might have been anticipated under other possible breaches...Furthermore, the amount fixed is reasonable to the extent that it approximates the loss anticipated at the time of making of the contract, even though it may not approximate actual loss.

See A. J. Lane, 113 B.R. at 828 (emphasis added); Restatement (Second) of Contracts §356, cmt. b (1981), A167.

These are alternative tests, and, in part, explain the necessity for the second evidentiary hearing on December 22, 2004. At the hearing on December 15, 2004, UPS amply evidenced to the court its actual damages as a result of the Debtors' prepayment, to wit, the loss of the $314,417.72 gain on the sale of the $5,000,000 loan. This clearly satisfied the actual damages standard under A.J. Lane; and, based upon proof of actual damages, the UPS Prepayment Premium attributable to the $5,000,000 loan should have been allowed as a matter of law. However, meeting this

[14] See Order, October 8, 2004, A36; MOD, A40.

reasonableness standard did not suffice under the undefined standards of the Bankruptcy Court, and the Bankruptcy Court scheduled a second hearing for further proof.

Having had its proof of actual loss disregarded by Judge Votolato following the hearing on December 15, 2004, UPS understandably anticipated that the Bankruptcy Court would apply the second Restatement (Second) Contracts test during the hearing on December 22, 2004, and it prepared accordingly. On that day, Mr. Dahms presented detailed testimony and evidence of the losses that the bank could reasonably have anticipated at the time of the closing, if the loans were prepaid and the bank had to re-deploy the funds. These losses were based upon the lost yield during the average time it would take the bank to re-lend the prepaid funds, and the costs associated with new loans of like amounts. Tr. 12/22 at 20-22, A91-A93; id. at 26-27, A94-A95; id. at 29, A97; id. at 31-32, A99-A100. On the basis of this evidence, UPS met the reasonableness standard under the second prong of the Restatement (Second) test, and the UPS Prepayment Premiums should have been allowed as a matter of law. However, this still did not satisfy the Bankruptcy Court, as its amorphous standard of reasonableness required "hard numbers," not reasonably anticipated approximations. See Tr. 12/22 at 12, A90.

Quoting A.J. Lane, 113 B.R. at 829, the Bankruptcy Court was of the opinion that the only significant losses that a lender might suffer as a consequence of a loan prepayment would be the "inability to re-loan the funds at an interest rate at least as high as the rates under the notes." MOD at 5, A45. Such a conclusion ignores not only the evidence presented at the hearings of December 15 and December 22, 2004, but, it also ignores the great weight of authority which recognizes that a lenders' loss upon prepayment of a loan includes:

> all of the interest to which the lender is entitled; the cost and expense of procuring a substitute borrower and the attendant risk and delay involved; the applicable rate of return; the duration of the loan and the risk involved in each specific transaction; the extent and

realizability of the collateral; and "other obvious uncertainties inherent in [the] particular contract."

Financial Ctr. Assocs., 140 B.R. at 836 (citation omitted); see Restatement (Third) of Property, Mortgages, §6.2 cmt. a, A170.

The one thing most evident from Judge Votolato's decision concerning the attempts by UPS to satisfy his demands for proof of loss is how difficult such proof actually was. Indeed, after all of the evidence, Judge Votolato expressed his own frustration: "At last the Debtors can relax, because I give up." MOD at 5, A45. Considering the Bankruptcy Court's reliance upon the Restatement (Second) of Contracts' formulation of the necessary standard of reasonableness, the difficulties evidenced by this case should have led to a different result. After reciting the two tests previously quoted, the Restatement (Second) Contracts continues: "The greater the difficulty either of proving that loss has occurred or of establishing its amount with the requisite certainty…the easier it is to show that the amount fixed is reasonable." Restatement (Second) of Contracts §356 cmt. b (emphasis added), A167; see In re United Merchants and Mfrs., Inc., 674 F.2d 134, 142 (2d Cir. 1982).[15] Considering the obvious difficulties UPS had in satisfying the requisite certainty, the "hard numbers," required by the Bankruptcy Court, the reasonableness of the UPS Prepayment Premiums should have been found as a matter of law.

As this Court reviews the propriety of the Bankruptcy Court's application of an amorphous standard to its determination of the allowability of the Prepayment Premiums under §506(b), this Court should be mindful of the rationale generally given for the departure from State law in this regard. In this regard, it is said that: "bankruptcy involves unique policy considerations; an improvident or excessive prepayment fee, if treated as a secured claim in the context of bankruptcy,

[15] Quoting Cotheal v. Talmage, 9 N.Y. 551, 554 (1854), on the subject of liquidated damages: "Where there is manifest difficulty in ascertaining damages arising from the breach … the parties should be held to their bargain …"

may act to deprive undersecured or unsecured creditors of assets needed to pay their claims." Restatement (Third) of Property, Mortgages, §6.2 cmt. d (emphasis added), A172; see, e.g., A.J. Lane, 113 B.R. at 824; In re Anchor Resolution Corp., 221 B.R. 330, 340-41 (Bankr. D. Del. 1998); In re Duralite Truck Body & Container Corp., 153 B.R. 708, *16-*20 (Bankr. D. Md. 1993); Financial Ctr. Assocs., 140 B.R. at 839. Indeed, in A.J. Lane, it was the Official Unsecured Creditor's Committee that challenged the lender's prepayment premium claim. See also Duralite, 153 B. R. 708, *7-*8 (challenge raised by Chapter 7 Trustee).

One wonders what equitable principle dictates that the secured creditor should suffer a loss for the benefit of the general unsecureds, as one might believe that equity protects those who protect themselves. Nevertheless, due recognition of the inherent equitable powers of the Bankruptcy Court requires due deference to the Bankruptcy Court's authority to safeguard the interests of the unsecured creditors of the estate.[16] As observed by the Court in Financial Ctr. Assocs., 140 B.R. at 839, the reasonableness standard of §506(b) is a "safety valve" designed to protect the bankruptcy estate and other creditors from egregious claims by a secured creditor.

In the present case, such a rationale does not apply. Here, the Debtors are solvent, and will retain the profits of their business and assets, although achieved, in part, though the financing provided by UPS. As the parties were sophisticated business people represented by legal counsel, it can not be said that their agreement was "improvident." Further, the actual damages suffered by UPS as a consequence of the prepayment, as well as the damages that could reasonably have been anticipated at the time of contracting, support the conclusion that the Prepayment Premiums are not "egregious."[17] In this context, the rationale and rule of A.J. Lane simply do not apply. See Carlyle Apartments Joint Venture v. AIG Life Ins. Co., 635 A.2d 366, 371-72 (Md.1994). There is no basis

---

[16] See 11 U.S.C. §105(a), A144.
[17] Compare 15 U.S.C. §636(a)(4)(c), A151; see footnote 13.

for employing a "safety valve" for the protection of the bankruptcy estate or the unsecured creditors in this case. For this reason, the UPS Prepayment Premiums are allowable as a matter of law.

If we must conclude that Bankruptcy Code §506(b) requires that a claim for prepayment premiums must be judged under a reasonableness standard, then the question presented is what standard to apply? If the standard is a reasonable person standard, then the fact that the parties, sophisticated businesses represented by legal counsel, freely agreed to the prepayment premiums leads to a presumption that the premiums are reasonable. See Holliston Mills, 604 A.2d at 338 ("[t]he agreement between the parties was fair and bargained for, and...represented a meeting of the minds"). On this basis UPS should prevail. If a congressional directive is presumptive evidence of reasonableness, then UPS should prevail. See 15 U.S.C. §636(a)(4)(c), A151. If the laws of the governing jurisdiction provide evidence of reasonableness, then UPS should prevail. See Holliston Mills, 604 A.2d at 338. If the opinion of drafters of the Restatement (Second) of Contracts §356 cmt. b provides acceptable standards by which to measure reasonableness, then under the facts of this case, UPS should prevail. And finally, if the test of reasonableness is premised upon considerations favoring the general creditors of a bankruptcy estate, then under the facts of this case, UPS should prevail.

By its disregard for these various, but nonetheless consistent standards, by its misapplication of the Restatement (Second) of Contracts standards, and by its application of its own amorphous standard, the Bankruptcy Court fulfilled the prediction of the Court in Financial Ctr. Assocs. and created a vacuum, "a vacuum that would be filled by non-uniform and inconsistent judge-made law." See Financial Ctr. Assocs., 140 B.R. at 839. This was error.

**2. The Bankruptcy Court Abused Its Discretion in Striking the Evidence that UPS Presented during the Evidentiary Hearing on December 22, 2004**

The lack of a well defined, single, federal standard of reasonableness understandably led to

further error in the Bankruptcy Court. In the first instance, there was an absence of authority defining the proper scope of evidence relevant to the proof of "actual damages." This created the necessity for the December 22, 2004 hearing. Then, by ignoring the complete formulation of the standard of reasonableness for liquidated damages under the Restatement (Second) of Contracts §356 cmt. b, the Bankruptcy Court failed to appreciate the relevance of the evidence presented by UPS at the hearing on December 22, 2004, thereby erroneously ruling that such evidence was "completely irrelevant." MOD at 4, A44. To the contrary:

> the actual damages suffered by a party for whose benefit a [liquidated damages] clause is inserted in a contract have little relevance to the validity of a liquidated damages clause. The soundness of such a clause is tested in light of the circumstance existing as of the time that the agreement is entered into...

Walter E. Heller & Co. v. American Flyers Airline Corp. 459 F.2d 896, at 898-99 (2d Cir. 1972) (citations omitted); see also In re United Merchants & Mfrs., Inc., 674 F.2d at 143; Financial Ctr. Assocs., 140 B.R. at 835-36.

At the same time, the Bankruptcy Court exacerbated its error by imposing the burden of proof upon UPS. See MOD at 6, A46. Again to the contrary, the burden of proving the unenforceability of a liquidated damage clause is properly assigned to the party challenging its validity. Honey Dew Associates, Inc. v. M & K Food Corp., 241 F.3d 23, 27-28 (1st Cir. 2001); Days Inns of America, Inc. v. Regency Manor, Ltd, 94 F. Supp. 2d 1200, 1204 (D. Kan. 2000); In re Snelson, 305 B.R. 255, 261 (Bankr. N.D. Tex. 2003); contra Pacheco v. Scoblionko, 532 A.2d 1036, 1039 (Me. 1987).

In the absence of controlling authority as to the proper standard of reasonableness under §506(b), or as to the proper allocation of the burden of proof, the Bankruptcy Court in effect set an unattainable moving target that evolved with the Bankruptcy Court's discretionary reading of A.J. Lane. These issues were material to the case. It is no wonder that Judge Votolato gave up. MOD

at 5, A45. "Judicial Discretion is necessarily broad, but not absolute. Abuse occurs when a material factor deserving of significant weight is ignored . . . ." In re Rijos, 263 B.R. 382, 389 n.6 (B.A.P. 1st Cir. 2001). Judge Votolato abused his discretion in striking the evidence presented by UPS on December 22, 2004.

**B. UPS Is Entitled to Recover the Prepayment Premiums Even if Such Premiums Are "Unreasonable" and Not Allowable as a Secured Claim under §506(b)**

Even if one were to assume that UPS is not entitled to recover the Prepayment Premiums as a secured claim under §506(b) (which it is) that still would not mean that the premiums were properly disallowed in full.[18] Rather, a finding that fees, costs or charges are unreasonable under §506(b) means only that they cannot be allowed as a secured claim, and instead must be treated as an unsecured claim. See Wezel v. Advocate Realty Inv., LLC, 275 F.3d 1308, 1318-19 (11th Cir. 2001); In re Imperial Coronado Partners, Ltd., 96 B.R. 997, 1001 n.2 (B.A.P. 9th Cir. 1989). This is not a case in which unsecured claims are not being paid. Rather, the funds generated by the sale to Tim Hortons are sufficient "to pay all creditors in full, plus interest," and still provide a "substantial surplus" to the Debtors. **Even if the Prepayment Premiums are not payable as a secured claim pursuant to §506(b), as a matter of law, they should have been allowed, and paid, as an unsecured claim.**

Finally, the Bankruptcy Court disallowed UPS's claim for Prepayment Premiums not only in the Gencarelli matter, but also in the Bess Eaton matter. Bess Eaton, however, did not file an objection to the prepayment premiums, and, consequently, there was no basis for disallowance in that matter.[19]

---

[18] The Bankruptcy Court denied the UPS Prepayment Premium claims "in full." MOD at 6, A46.

[19] The cases were consolidated for administrative purposes only. The assets and liabilities of the two estates were not consolidated for purposes of affecting substantive rights. See footnote 10.

**Conclusion**

A consistent and harmonized body of law upon which people and businesses may reasonably rely in the conduct of their affairs is a hallmark of good jurisprudence.[20] A disregard of substantive state law in order to presumably create a separate body of substantive bankruptcy law causes confusion and uncertainty in derogation of the expectations of those whom the law presumes to serve by creating anomalies between the state and federal courts sitting in the same jurisdiction. Compare Sharman, 2004 R.I. Super. Lexis 110, with A.J. Lane, 113 B.R. 821. In this regard, the decision of the Court in Financial Ctr. Assocs., 140 B.R. 829, is most instructive and persuasive. The uncertainties created by the approach adopted by the A.J. Lane court, as evidenced by the anomalous result in the Bankruptcy Court, lead to a legal vacuum. It has been said that "nature abhors a vacuum."[21] The same may fairly be said of commerce. In creating such a vacuum with regard to the issues presented in this case, the Bankruptcy Court erred.

Regardless of whether state law, a combined state-federal standard or a "single" federal standard of "reasonableness" applies under §506(b), UPS is entitled, as a matter of law, to recover the prepayment premiums as a secured claim. Moreover, §506(b) is not a disallowance provision: the extent that the prepayment premiums are not "reasonable" within the meaning of §506(b), they are recoverable as an unsecured claim. The Bankruptcy Court abused its discretion and rendered a decision that is the offspring not of a defined standard, but of uncertainty and confusion. The judgment of the Bankruptcy Court should be reversed and the cases remanded with direction to allow UPS's claims for prepayment premiums.

---

[20] It is a well established cannon of statutory construction that Courts should avoid interpretations that lead to unworkable results. See, e.g., Nixon v. Mo. Mun. League, 541 U.S. 125, 138 (2004); United States v. American Trucking Ass'ns, 310 U.S. 534, 543 (1940); see also 229 Main St. Ltd. Pshp. v. Mass. EPA, 262 F.3d 1, 9 (1st Cir. 2001) (declining to adopt an interpretation of the Bankruptcy Code that would lead to an absurd result).

[21] Attributed to the French monk, Francois Rabelais (1494-1553). See Bartleby's Quotations, 45765, A159.

Respectfully submitted,
THE APPELLANT,
UPS CAPITAL BUSINESS CREDIT

EDWARD J. PONTACOLONI, ESQ., *pro hac vice*
Barbara A. Frederick, Esq., *pro hac vice*
Updike, Kelly & Spellacy P.C.
One State Street
P.O. Box 231277
Hartford, CT 06123
Tel: (860) 548-2647
Fax: (860) 548-2680
CT Juris No: 65040

THOMAS J. CRONIN, ESQ. #5302
Gunning & Lafazia, Inc.
56 Pine Street
Providence, RI 02903
Tel: (401) 521-6900
Fax: (401) 521-6901
Juris No: 5302

CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing has been mailed first class, postage prepaid, this 14th day of April 2005, to the following counsel and pro se parties of record:

Joseph P. Ferrucci, Esq.
Christopher M. Mulhearn, Esq.
Ferrucci Russo P.C.
55 Pine Street
4th Floor
Providence, RI 02903-2841

James T. Simmons, Esq.
56 Pine Street
Providence, RI 02903
Tel: (401) 272-5800
Fax: (401) 272-5858
Juris No: 4035

THOMAS J. CRONIN, ESQ.